UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X

UNITED STATES OF AMERICA                17 CR 353 (4)

                                        MEMORANADUM
                                        AND ORDER

             -against-


MAYURA KANEKAR,

             Defendant.
-----------------------------------------------------X

APPEARANCES

RICHARD P. DONOGHUE
United States Attorney
Eastern District of New York
217 Cadman Plaza East
Brooklyn, NY 11201
By:    Richard A. Powers
       A. Brendan Stewart
       Andrew Estes
*Attorneys for the Government*

WILSON SONSINI GOODRICH & ROSATI PC
1301 Avenue of the Americas
40th floor
New York, NY 10019
By:    Morris J. Fodeman
       Katherine Talbot McCarthy
       Catherine Sara Grealis
*Attorneys for Mayura Kanekar*

**Johnson, Senior District Judge:**

Mayura Kanekar ("Kanekar" or "Defendant") is charged, with others, in a 15-count superseding indictment ("the Indictment") alleging a seven-year conspiracy consisting of money laundering, conspiring to pay healthcare kickbacks, conspiring to commit health care fraud and conspiracy to defraud the Internal Revenue Service ("IRS"). (Dkt. No. 95.) Defendant Kanekar filed a motion to suppress prior statements and materials she gave to government agents, a motion for a bill of particulars, and a motion for *Brady* materials. (Dkt. No. 122.) Based on the submissions of the parties, oral argument held on September 26, 2019, and for the following reasons, the motion to suppress is **DENIED**, the motion for a bill of particulars is **DENIED** in part and **GRANTED** in part, and the motion to compel disclosure of *Brady* material is **DENIED**.

## I. Motion to Suppress

### A. Factual Background[1]

Kanekar is a licensed occupational therapist who was authorized to bill Medicare and Medicaid for medical services such as

---

[1] Unless otherwise noted, all facts are taken from the indictment and the parties' briefing on the instant motion. (Dkt. Nos. 95, 122-125, 192, 195, 198.)

occupational and physical therapy. She moved to Florida in 1997 to begin her career as an occupational therapist. In 1999, she moved to New York, where she practiced at a medical center in Brooklyn. In 2008, she met Mark Tsyvin ("Tsyvin") and Aleksandr Pikus ("Pikus") after responding to an advertisement seeking occupational therapists to provide outpatient treatment at a clinic.[2] She joined the clinic staff, where Tsyvin was an office manager and Pikus attended to billing. Shortly after, the three agreed to expand their business.

In 2009, Kanekar incorporated Excel Occupational Therapy Services P.C. and Able Occupational Therapy Services, P.C. in 2011. Pikus and Tsyvin supposedly handled all administrative aspects of the businesses, including securing office space and paying overhead, retaining and compensating office staff, and managing payroll and billing. (Dkt. No. 122-1 at 2.) Kanekar states that she was responsible for all clinical aspects of the practice — treating patients and overseeing other therapists. (*Id.*)

Kanekar is alleged to have participated in a scheme to have Medicaid and Medicare beneficiaries seek out medically unnecessary

---

[2] Pikus and Tsyvin are co-defendants in the related healthcare fraud case, styled *United States v. Pikus*, No. 16-cr-329.

P-049

services in exchange for cash kickbacks. Kanekar would then, supposedly, submit claims for these services to Medicaid and Medicare. The bulk of those payments were then paid back to Tsyvin and Pikus in exchange for patient referrals. Tsyvin and Pikus were arrested for their roles in the alleged scheme on June 20, 2016—a fact of which Kanekar was aware. Beginning the following month, over a period of about nine weeks, government agents interviewed Kanekar four times in relation to the alleged scheme. Kanekar was not in custody nor was she represented by counsel during any of the four interviews.

On July 15, 2016, Special Agent Lizbeth Rolon of the Department of Health and Human Services' Office of Inspector General, Special Agent Stephen Stier of the Internal Revenue Service, and Senior Investigator Alex Shaporov (collectively "the agents") appeared at Defendant Kanekar's home. Kanekar believed that they were there to question her about the investigation against Tsyvin and Pikus and that she was not under investigation at that time. (Affidavit of Mayura Kanekar, Nov. 8, 2018 (Aff.) at ¶ 3.) Kanekar claims that she explicitly asked the agents whether she needed an attorney to which Agent Stier responded she did not because they only had a few

4

questions. (*Id.*) Agent Rolon recalled some conversation about an attorney but denied that anyone told Kanekar that she did not need one (Transcript of Suppression Hearing Held on Sept. 26, 2019 (Tr.) at 11:21), Agent Stier could not recall the details surrounding the conversation but states the agents told Kanekar "it was entirely her decision," (Tr. at 132:14) while Agent Shaporov denies any discussion about an attorney took place whatsoever. (Tr. at 151-152.)

The length of the interview is also disputed. Kanekar claims it lasted five hours, while the agents each gave differing accounts during the suppression hearing, from one to two to three hours. (Tr. at 6:22; 133:12; 152:13.) The interview took place in Kanekar's kitchen in the presence of her husband. By all accounts, this initial interview was conducted in a calm manner and at no point did any of the agents raise their voices. Kanekar shared emails, checks from her companies, and her passport with the agents. (Aff. at ¶ 4.) The agents informed her not to delete any information from her cell phone and they would want to collect it at a future date. (*Id.*) As the agents were leaving, Kanekar claims she was told not to tell anyone about the interview, which she claims to have understood to include lawyers. (*Id.*) Agent Rolon claims that she told the couple in substance, "not to discuss it

5

because it was still an ongoing investigation, but at the end of the day she was free to discuss it with whomever she wished." (Tr. at 12:6-8.)

On July 18, 2016, Agent Rolon appeared at Kanekar's place of employment and took the Defendant's phone and password to her iCloud (an electronic storage account). Kanekar does not dispute that she signed a "Consent to Search Electronic Device" form which provided:

> I give this consent to search freely and voluntarily without fear, threat, coercion, or promises of any kind and with full knowledge of my constitutional right to refuse to give my consent for the removal and/or search of the aforementioned equipment/data, which I hereby waive. I am also aware that if I wish to exercise this right of refusal at any time during the seizure and/or search of the equipment/data, it will be respected.

(Dkt. No. 124-1.) However, the parties disagree as to when this form was signed. Kanekar claims that she only signed the form after the government returned her phone (Aff. at ¶ 6), while the Government asserts that Kanekar signed the form before the phone was imaged. (Tr. at 15-16.) Kanekar also signed a "Chain of Custody" form upon releasing and receiving her cell phone from the agents and a "Final Disposition" form to indicate that the phone had been returned. (Dkt.

6

No. 195-1, Ex. A). In all, Kanekar signed her name four times in connection with the imaging of her phone. (*Id.*)

Rolon briefly interviewed Kanekar again on July 21, 2016 by telephone. Days later, per Rolon's instructions, Kanekar emailed Rolon screenshots of messages she had with Maksim Grushkovskiy, a defendant in the related Pikus case. (Aff. at ¶ 8.) Finally, on September 22, 2016, Agent Rolon and Investigator Shaporov questioned Kanekar at a diner. Kanekar claims that during this interview, she "was told [she] needed to hand over any medical records of [her] patients that [she] had in [her] possession." (Aff. at ¶ 9.) The agents claim that they asked Kanekar if they could come pick up the medical records from her home to which she agreed. (Tr. at 24-25.) At the end of the interview, the agents advised Kanekar to obtain a defense attorney and she immediately began searching for representation. Four days later, they arrived at Kanekar's home and collected the medical records. (Aff. at ¶ 10.)

### B. Legal Standard

Kanekar does not claim to have been in custody during any of the four interviews. Thus, the question before the court is simply, "whether the statements were voluntary, i.e., the product of an

7

essentially free and unconstrained choice by [their] maker,'" or if they were "coerced by police activity in violation of constitutional rights not to incriminate oneself and due process." *United States v. Haak*, 884 F.3d 400, 409 (2d Cir. 2018) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 224 (1973)). Ultimately, the court must look at the totality of the circumstances surrounding the interviews and determine if Kanekar's "will was overborne by the [agents'] conduct." *Haak*, 884 F.3d at 409.

"[E]vidence that the accused was threatened, tricked, or cajoled into a waiver will of course, show that the defendant did not voluntarily waive [her] privilege." *Miranda v. Arizona*, 384 U.S. 436, 476 (1966). While not always enough to prove involuntariness, "[a]ffirmative misrepresentations by the police may be sufficiently coercive to invalidate a suspect's waiver of the Fifth Amendment privilege." *United States v. Anderson*, 929 F.2d 96, 100 (2d Cir. 1991). "To prevail on a claim of trickery and deception, [Kanekar] 'must produce clear and convincing evidence that the...agents affirmatively misled [her] as to the true nature of their investigation." *United States v. Mitchell*, 966 F.3d 92, 100 (2d Cir. 1992) (quoting *United States v. Okwumabua*, 828 F.2d 950, 953 (2d Cir. 1987).

8

## C. Discussion

Defendant Kanekar argues that the statements and material provided to law enforcement prior to her arrest should be suppressed because she was tricked into waiving her Fifth Amendment right against self-incrimination in the initial interview, and all subsequent statements and materials are fruit of the poisonous tree. The only misconduct Kanekar alleges by the agents at the initial interview is an affirmative statement by Agent Stier that she did not need an attorney and an order to not discuss the case with others. By all other measures, the interview was unremarkable and appeared consensual: Kanekar is an educated professional (Tr. at 7:8-12), the agents were invited into the home (Tr. at 129:6-8; 150:10), it took place in the comfort of her kitchen and in the presence of her husband (Tr. at 6:16-20), the officers were in street clothing (Tr. at 6:5), the tone was described as "calm" and "friendly," (Tr. at 8-9; 153-154) and there is no evidence that Kanekar ever expressed reluctance to share information with the agents.

Kanekar's affidavit is the only evidence offered in support of her position. It states in relevant part: "I specifically asked the agents whether I needed an attorney. Agent Stier told me I did not need an

attorney, as the agents only had a few questions." Aff. at ¶ 3. She further claims, "[i]f the agents had not affirmatively told me that I did not need an attorney, I would not have spoken at all with the agents or have provided them with any of the material they demanded without first retaining legal counsel." Aff. at ¶ 13.

While neither Kanekar or her husband testified at the suppression hearing, all three agents testified and were subject to cross examination. As expected, there are some discrepancies in their testimony about the exact events that occurred several years ago at Kanekar's home. However, the agents were unanimous in their positions that Agent Stier never affirmatively told Kanekar that she did not need an attorney. In light of their testimony, Kanekar's unsupported affidavit is far from "clear and convincing evidence that the...agents affirmatively misled [her] as to the true nature of their investigation." *Mitchell*, 966 F.3d at 100. Further, Kanekar's claim that she would not have divulged any information or materials had she not been told that she did not need an attorney is belied by the fact that after the agents advised Kanekar to get an attorney at their September 22 meeting, she handed over boxes of medical records to the agents four days later. (Aff. at ¶ 10.) While the exact events that

transpired at Kanekar's home on July 15, 2016 are impossible for the Court to know, the preponderance of the evidence shows that Kanekar's statements were voluntary and not the product of coercion.

Because Kanekar's statements were not coerced in violation of her Fifth Amendment rights, her fruit of the poisonous tree arguments have no merit. To the extent that Kanekar argues that the imaging of her phone was an independent constitutional violation, the argument fails for similar reasons as above. The only evidence Kanekar offers to demonstrate coercion is her unsupported affidavit which claims that the agents "demanded" her cell phone and that she only signed the consent form after the search was complete. (Aff. at ¶ 6.) Kanekar offers no explanation whatsoever as to why she signed the consent form if it was presented to her after-the-fact if she supposedly did not consent to the search. Nor does Kanekar mention the three other signatures she gave in relation to the cellphone search.

In contrast, both government agents that were present for the phone imaging testified at the suppression hearing and were subjected to extensive questioning by defense counsel. Agent Rolon testified that she "asked," in contrast to "demanded," to image Kanekar's cellphone (Tr. at 81:22) and that Kanekar was provided

11

with the consent form prior to the search. (Tr. at 16:1.) She also testified that Kanekar signed the Chain of Custody form at the time she handed her phone over (Tr. at 14:10-11), and again when she received it back along with a Final Disposition form. (Tr. at 19:9-22.) Jorge Ramirez, a forensic computer examiner at the U.S. Department of Health and Human Services who imaged the phone, testified that he had little memory of the exact events that transpired on July 18, 2016. (Tr. 168-175.) His lack of recollection is by no means surprising given his small role in this investigation over three years prior and far from discredits Agent Rolon's version of events.

In the absence of any corroboration whatsoever, Kanekar's claim that she did not consent to the imaging of her cellphone is unavailing. Considering the totality of the circumstances, the government has proven by a preponderance of the evidence that consent to search Kanekar's cellphone was given voluntarily and without coercion.

## II. Bill of Particulars

Kanekar also moves for a bill of particulars, pursuant to Rule 7(f) of the Federal Rules of Criminal Procedure. Kanekar argues that

P-049

the Indictment is vast and sprawling as to the fraud alleged and that the discovery provided, with productions beginning in August 2017, has been too voluminous to apprise Defendants of the charges against them.

## A. Legal Standard

A bill of particulars is appropriate if an indictment lacks sufficient detail to allow a defendant "to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987). It is in the Court's "sound discretion" as to whether to order the Government to issue a bill of particulars. *United States v. Panza*, 750 F.2d 1141, 1148 (2d Cir. 1984). "Generally, if the information sought by defendant is provided in the indictment or in some acceptable alternate form, no bill of particulars is required." *Id.* at 574. The government is under no obligation to "particularize all of its evidence, . . . disclose the precise manner in which the crimes charged in the indictment were committed, or . . . provide the defendant with a preview of the Government's case or legal theory." *United States v. Kogan*, 283 F. Supp. 3d 127, 132 (S.D.N.Y. 2017) (internal citations and quotations

omitted). "Accordingly, the proper inquiry on a motion to compel a bill of particulars is whether the information sought is necessary, not whether it is helpful." (*Id.*)

However, the Government does not fulfill its discovery obligation, "merely by providing mountains of documents to defense counsel." *Bortnovsky*, 820 F.2d at 575. "[A] large volume of discovery warrants a bill of particulars if it obfuscates the allegedly unlawful conduct and unfairly inhibits the defendant's preparation for trial." *United States v. Mahaffy*, 446 F. Supp. 2d 115, 119-20 (E.D.N.Y. 2006).

**B. Discussion**

Defendant Kanekar makes four separate requests for information through a bill of particulars: 1) a complete list of financial transactions underlying the conspiracy to commit money laundering charge, 2) a complete list of tax returns and false statements on tax returns underlying the tax fraud charges, 3) which specific Medicare or Medicaid regulations she supposedly violated, and 4) a list of unindicted co-conspirators. (Dkt. No. 122-1 at 12-14.)

First, the Court denies Defendant's motion to identify all the financial transactions that support the conspiracy to commit money laundering charge (Count Three). Kanekar claims that "while

14

discovery in this case includes mountains of financial records and checks...the Superseding Indictment identifies only one check allegedly written by Ms. Kanekar as an 'overt act' in support of its conspiracy...charge." (Dkt. No. 122-1 at 13.) The government correctly points out that the money laundering conspiracy statute that Kanekar is charged with does not require the government to prove an overt act. *See* 18 U.S.C. § 1956(h); *Whitefield v. United States*, 543 U.S. 209, 214 (2005) ("Because the text of § 1956(h) does not expressly make the commission of an overt act an element of the conspiracy offense, the Government need not prove an overt act to obtain a conviction."). However, the financial transactions are not merely evidence of an "overt act" but may be used as proof of the conspiracy itself. Indeed, the Government has indicated it plans to introduce the information in its case-in-chief. To that end, the Government has offered to provide Kanekar with the requested information within sixty days of trial and has already provided the "underlying banking and check-cashing records." (Dkt. No. 124 at 14.) To the extent that an itemized list of financial transactions is "necessary" and not merely "helpful" for Kanekar to prepare an adequate defense, the Court finds the sixty day offer by the Government to be sufficient.

15

P-049

Second, the Court also rejects Kanekar's request for all "allegedly false statements the government intends to offer and in which tax returns those may be found...." (Dkt. No. 122-1 at 14.) With regards to Count Five (subscribing to a false and fraudulent tax return), the Government clearly identified "the specific tax return and false statement by line number and dollar amount" it intends to introduce at trial. (Dkt. No. 124 at 15.) As to Count Four (conspiracy to defraud by obstructing the lawful functions of the IRS), the Government has alleged in the Indictment that the defendants "falsely reported to the IRS that the payments they made to the Kickback Shell Companies were real and legitimate business expenditures" while knowing "a substantial portion of this money was paid for illegal patient referrals." (Dkt No. 95 ¶ 41.) The Indictment also lists the three types of forms that were filed with the IRS that contained the under-reported income and false claim reductions. (*Id.*) Accordingly, the "defendant has already been given adequate notice of the charges against [her] in the indictment or through discovery." *United States v. Yu*, 1998 WL 57079, at *3 (E.D.N.Y. Feb. 5, 1998). Kanekar's request for "each specific misrepresentation and omission alleged is simply a request to compel the production of the very type of evidentiary

16

minutiae that is not appropriate in a bill of particulars." *U.S. v. Levy*, 2013 WL 664712, *13 (S.D.N.Y. Feb. 25, 2013) (denying a similar request in a securities fraud case).

Third, the Court grants the Defendant's motion to identify the specific Medicare and Medicaid provisions that Kanekar is alleged to have violated with regards to the provision of medical services. The Indictment alleges that Kanekar submitted claims that "were not supervised by licensed professionals as required and not performed by professionals trained and authorized to perform those medical services." (Dkt. No. 95 at 9) However, the Indictment does not indicate any laws or regulations that govern such services. In response, the Government points out that "Kanekar is not charged with merely 'violating Medicare rules and regulations,'" but with "conspiracy to commit health care fraud, conspiracy to pay health care kickbacks, and submitting false claims." (Dkt. No. 124 at 14.)

The criminal statutes that Kanekar is being charged with are provided in the Indictment. As a result, Kanekar is not entirely "blind in determining how she even allegedly violated the law," as claimed. (Dkt. No. 122-1 at 15.) However, the laws surrounding Medicaid and Medicare are extraordinarily complex and without additional

17

information, Kanekar may not fully understand the charges against her. *See United States ex rel. Wilkins v. United Health Grp., Inc.* 659 F.3d 295, 310 (3d Cir. 2011) ("We think that anyone examining Medicare regulations would conclude that they are so complicated that the best intentioned plan participant could make errors in attempting to comply with them."). Accordingly, the Court finds that this information is necessary to "clarif[y] the charges against the defendant," so that she may adequately prepare her defense. *United States v. Gotti*, 784 F. Supp. 1017, 1019 (E.D.N.Y. 1993). This ruling is limited to the alleged services that Kanekar identified in her motion, *i.e.*—that were either "not supervised by licensed professionals as required and not performed by professionals trained and authorized to perform those medical services." (Dkt. No. 95 at ¶ 28.)

Finally, the government shall provide a bill of particulars disclosing the unindicted co-conspirators. A bill of particulars is required if an indictment lacks sufficient detail to allow a defendant to "prepare for trial" or "prevent surprise." *Bortnovsky*, 820 F.2d at 574. When "there are a large number of co-conspirators and a long-running conspiracy, a defendant is more likely to be surprised by the identity of other co-conspirators, whom [s]he may never have met..."

18

*Nachamie*, 91 F. Supp. 2d at 572-73 (granting a request for names of unindicted co-conspirators in a healthcare fraud case where there were eight defendants and an unknown number of unindicted co-conspirators, the conspiracy lasted over three years, and the government produced over 200,000 pages of discovery). This case has four defendants, is linked to numerous other cases, has multiple unnamed co-conspirators, there are reportedly over 500,000 discovery documents, and involves a scheme that the government alleges occurred over the span of seven years. These factors increase the likelihood of surprise at trial and weigh heavily in favor of disclosure. The government's only response is that it has "identified at least eight co-conspirators as well as entities that they owned and operated." (Dkt. No. 124 at 13.) Without explanation, the government claims that "further identification of co-conspirators is unnecessary." (*Id.* at 13-14.) This assurance is of little value to the Defendant attempting to prepare her case for trial. Accordingly, the government shall provide Kanekar with the names of all unindicted co-conspirators she is alleged to have commit the charged acts with. *See United States v. Failla*, 1993 WL 547419 (E.D.N.Y. 1993) ("The request for the names of

19

unindicted co-conspirators is a fairly common request and one that is generally granted by the district courts.").

## III.    Motion to Compel *Brady* Material

Finally, Defendant Kanekar moves to compel immediate disclosure of *Brady* material. Kanekar does not assert any knowledge of wrongdoing by the government or withholding of specific materials but rather reiterates the Government's constitutional obligations and states that the Government has "brushed aside Ms. Kanekar's prior pleas for *Brady* material." (Dkt. No. 122-1 at 15.) The Government responds that it "understands and is complying with its continuing obligations under *Brady*…and, to the extent it comes across *Brady* material, it is disclosing it." (Dkt. No. 124 at 16.) The Court is satisfied that the Government understands its constitutional obligation and without more specific allegations from Kanekar, sees no reason to order disclosure of information that is constitutionally mandated. Accordingly, the motion to compel *Brady* materials is denied with leave to renew should Kanekar develop reason to believe the Government is withholding exculpatory evidence.

P-049

## IV.    CONCLUSION

For the foregoing reasons Defendant Kanekar's motion to suppress is **DENIED**, her motion for a bill of particulars is **DENIED** in part and **GRANTED** in part, and her motion to compel disclosure of *Brady* materials is **DENIED**.

**SO ORDERED.**

Dated:  February 12, 2020
Brooklyn, New York

s/ Sterling Johnson, Jr.

Sterling Johnson, Jr.,
U.S.D.J.

P-049