UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

– against –                                    **MEMORANDUM & ORDER**

WAEL BAKRY,                                     17-cr-353 (ERK)
ABRAHAM DEMOZ, and
MAYURA KANEKAR

                        Defendants.

KORMAN, *J.*:

Following her acquittal at trial, Defendant Mayura Kanekar ("Kanekar")

moves, through her attorney, for an award of $845,750.70 of attorneys' fees and other

litigation expenses[1] pursuant to the Hyde Amendment, arguing that she is entitled to

such reimbursement as a result of the "tremendous amount of damage wrought by a

frivolous, vexatious, and bad faith prosecution."  ECF No. 391 ("Reply Br.") at 1.

For the reasons set forth below, Kanekar's motion is denied.

## FACTUAL BACKGROUND

This motion relates to Kanekar's charged involvement in a health care fraud

kickback scheme.  On July 5, 2017, a grand jury returned an indictment charging

---

[1] Kanekar's counsel claims that Kanekar paid his firm $782,519.14 in fees over the course of the representation.  *See* ECF No. 380-2 at 2.  But in earlier filings, Kanekar and her counsel claimed that the firm did not bill Kanekar for any services since May 2018, *see* ECF No. 307 at 2 n.1, 307-1 at 2, and the firm began representing her only in August 2017, *see* ECF No. 42.

Kanekar with conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349, and conspiracy to defraud by obstructing the lawful function of the Internal Revenue Service in violation of 18 U.S.C. § 371.  ECF No. 1.  On June 20, 2018, a grand jury returned a superseding indictment charging Kanekar with the following additional charges: conspiracy to pay healthcare kickbacks, in violation of 18 U.S.C. § 371; money laundering conspiracy in violation of 18 U.S.C. § 1956(h); subscribing to a false and fraudulent tax return in violation of 26 U.S.C. § 7206(1), and two counts of submitting false claims in violation of 18 U.S.C. § 287.  ECF No. 95.

On May 23, 2022, Kanekar went to trial alongside co-defendants Wael Bakry and Abraham Demoz.  According to the U.S. Attorney's theory of the case, the defendants, including several other co-conspirators who were charged and convicted separately in this district, engaged in a long-running scheme to defraud Medicare and Medicaid in which patients were steered to certain clinics by virtue of kickbacks paid to clinic managers, ambulette drivers, and others.  *See, e.g.*, *United States v. Pikus*, No. 16-cr-329 (AMD) (five defendants; four plead guilty; one convicted at trial); *United States v. Noykhovich*, No. 15-cr-185 (ARR) (one defendant; plead guilty); *United States v. Azimov*, No. 16-cr-320 (SJ) (one defendant; plead guilty); *United States v. Rubenov*, No. 18-cr-173 (ILG) (one defendant; plead guilty); *United States v. Mikhail*, No. 16-cr-73 (EK) (one defendant; plead guilty); *United States v. Dron*, No. 15-cr-29 (ERK) (one defendant; plead guilty); *United States v. Sudman*,

No. 16-cr-321 (SJ) (one defendant; plead guilty); *United States v. Izgelov*, No. 17-cr-159 (SJ) (one defendant; plead guilty).

Specifically as to Kanekar, the U.S. Attorney sought to prove her culpability for two distinct schemes: first, the "kickback scheme," in which Kanekar purportedly paid the managers of the clinic in which Kanekar maintained an occupational therapy practice, in order to provide patients to Kanekar in exchange for payments; and second, the "false claims scheme," in which Kanekar allegedly submitted fraudulent claims to Medicare using her unique national provider identifier number during periods when she was out of the country.  The evidence introduced by the prosecution showed that from April 2010 through June 2016, Kanekar, through two companies owned by her, billed nearly $35 million to Medicare, and received $15 million from Medicare in return.  *See* GX-2208.

The trial lasted approximately three weeks, during which the U.S. Attorney called to the stand fourteen witnesses and introduced over 500 exhibits into evidence.  On June 13, 2022, the jury found Kanekar, Bakry, and Demoz not guilty on all charges.  ECF No. 374.  Unlike her co-defendants, Kanekar subsequently filed the instant motion seeking litigation fees and attorneys' expenses.  ECF No. 387.

## LEGAL STANDARD

The Hyde Amendment, passed in 1997, permits district courts to award a prevailing criminal defendant "a reasonable attorney's fee and other litigation

expenses, where the court finds that the position of the United States was vexatious, frivolous, or in bad faith, unless the court finds that special circumstances make such an award unjust."  Hyde Amendment, Pub. L. No. 105-119, 11 Stat. 2440 (1997) (codified as a note following 18 U.S.C. § 3006(A)).  The "position" of the United States refers to "the government's general litigation stance: its reasons for bringing a prosecution, its characterization of the facts, and its legal arguments." *United States v. Bove*, 888 F.3d 606, 608 (2d Cir. 2018).  "For the government's position to be 'vexatious, frivolous, or in bad faith,' the prosecution must have been brought (a) to hector or intimidate the defendant on shaky factual or legal grounds (vexatious); (b) without even a reasonably arguable factual and legal basis (frivolous); or (c) with an element of intentional deceit or dishonesty (in bad faith)." *Id*. at 608-09; *see also id*. at 609 n.12 (summarizing the legislative history of the Hyde Amendment as discussed at length in *United States v. Gilbert*, 198 F.3d 1293 (11th Cir. 1999)).

In *United States v. Schneider*, the Second Circuit relied on certain dictionary definitions of "vexatious," "frivolous," and "bad faith" in assessing a motion for attorneys' fees under the Hyde Amendment.  *See* 395 F.3d 78, 86 n.3 (2d Cir. 2005) (Katzmann, *J.*).  As the Second Circuit observed, at the time that the Hyde Amendment was passed, the Sixth Edition of *Black's Law Dictionary* defined "vexatious" as "[w]ithout reasonable or probable cause or excuse," *Black's Law Dictionary* 1565 (6th ed.  1990); a "frivolous" pleading as one "clearly insufficient

on its face," *id*. at 2548; a "frivolous" claim as one for which its proponent "can present no rational argument based upon the evidence or law in support of that claim," *id*.; and "bad faith" as "not simply bad judgment or negligence, but rather the conscious doing of a wrong because of dishonest purpose of moral obliquity," *id*. at 668. Similarly, *Webster's Third New International Dictionary* defines "vexatious" as "causing or likely to cause vexation" or "lacking justification and intended to harass." *Webster's Third New International Dictionary* 2548 (3d ed. 1993).

Thus, the standard for awarding attorneys' fees under the Hyde Amendment is "intentionally demanding." *Bove*, 888 F.3d at 609 n.12; *accord United States v. Reyes-Romero*, 959 F.3d 80, 92 (3d Cir. 2020) ("[A] criminal defendant seeking costs and fees under the Hyde Amendment faces a 'daunting obstacle.'") (quoting *United States v. Isaiah*, 434 F.3d 513, 519 (6th Cir. 2006)); *United States v. Manchester Farming P'ship*, 315 F.3d 1176, 1184 (9th Cir. 2003) (remarking that the policy reason for the Hyde Amendment is "to protect defendants from *outlandish* Government prosecutorial misconduct" (emphasis added)). "An acquittal, without more, will not lead to a successful Hyde Amendment claim, as it was Congress's intent to 'limit Hyde Amendment awards to cases of affirmative prosecutorial misconduct rather than simply any prosecution which failed.'" *Schneider*, 395 F.3d at 88 (quoting *United States v. Knott*, 256 F.3d 20, 29 (1st Cir. 2001)). Nor is a

motion for attorneys' fees under the Hyde Amendment "an exercise in 20/20 hindsight," as "[t]he trial process is fluid and involves multiple strategic and evidentiary decisions, many of which cannot be predicted at the outset, and many of which depend on contested evidentiary and other trial rulings—not to mention the uncertainties associated with witnesses' testimony." *Schneider*, 395 F.3d at 87-88 (quoting *United States v. Sherburne*, 249 F.3d 1121, 1127 (9th Cir. 2001)). Therefore, "trivial instances of offending conduct" do not suffice to justify an award of fees under the Hyde Amendment; rather, the vexatious, frivolous, or bad faith conduct must be "substantial or significant." *Schneider*, 395 F.3d at 90.

## DISCUSSION

### I.    Kanekar Has Not Demonstrated that Her Prosecution Was Vexatious, Frivolous, or in Bad Faith

Kanekar fails to show that the prosecution in this case was vexatious, frivolous, or in bad faith so as to justify an award of attorneys' fees under the Hyde Amendment—nor could she.  The indictment charging Kanekar and her co-defendants was just one part of a wide-ranging and sophisticated criminal scheme occurring over the course of years involving over a dozen defendants defrauding government healthcare programs of tens of millions of dollars.  In light of the substantial amount of testimonial and documentary evidence of Kanekar's guilt presented at trial, and the lack of any prosecutorial behavior in the record that could

be considered even remotely "bad faith," "vexatious," or "frivolous," Kanekar's motion is without merit.

### A. The U.S. Attorney's Theory of the Case Remained Consistent Throughout Kanekar's Trial

Kanekar argues that the prosecution presented a "baseless and shifting" theory of liability at trial.   ECF No. 388 ("Br.") at 4.   I disagree.   The core of the prosecution's case was straightforward: that Kanekar knowingly participated in the scheme to defraud Medicare and Medicaid by illegally paying kickbacks to clinic managers in exchange for patient referrals to Kanekar.   The clinic managers and ambulette drivers in turn paid kickbacks to patients to have them submit to medical procedures that would be billed to Medicare or Medicaid.

As noted by the U.S. Attorney, ECF No. 390 ("Opp. Br.") at 4, the operative superseding indictment is clear as to the theory of Kanekar's guilt, alleging that:

> Between approximately June 2009 and June 2016, the defendant[] … MAYURA KANEKAR … , together with others, agreed to execute and executed a scheme to enrich themselves whereby they: (a) paid kickbacks to co-conspirators in return for the referral of beneficiaries to their Professional Corporations; [and] (b) submitted and caused to be submitted claims to Medicare and Medicaid on behalf of beneficiaries who were recruited through the payment of kickbacks.

ECF No. 95 ¶ 28.

The plain language of the indictment, which was returned on June 20, 2018 (nearly four years prior to trial), renders inexplicable the assertions by Kanekar's

counsel that he learned only at opening statements during trial that the U.S. Attorney

was alleging that Kanekar was illegally paying kickbacks to the clinic managers:

> MR. FODEMAN: I always understood from the bill of particulars, from all
> the correspondence, this is a case about patients getting paid kickbacks. That's
> what I understood the crime was. That's what we're ready to defend. That's
> it. Now I'm hearing Mr. Estes say … is just paying the managers to promote
> the business is in and of itself a crime? Is that what he's saying? Because
> that's not what's been articulated in the past. […]
> MR. ESTES: Your Honor, to be very clear, this is not a new theory. … It's in
> the superseding indictment. There have been discussions with counsel over
> the years. There have been motions as well. This is not some sort of new
> game-changing theory, just to be clear.
> MR. FODEMAN: […] It's news to me. I don't know why I wasn't paying
> attention to what the Government was trying to accuse my client of for half a
> decade.

Trial Tr. at 273:8-17, 274:1-6, 275:18-20.

Simply put, nothing in this exchange, followed by the U.S. Attorney's

thorough presentation of evidence at trial over the following three weeks, suggests

that the U.S. Attorney was presenting a theory at trial that was inconsistent with the

superseding indictment—much less one that was vexatious, frivolous, or in bad faith.

*See Schneider*, 395 F.3d at 90 (citing Pub. L. No. 105-119, § 617, 111 Stat. 2440,

2519) (observing that the Hyde Amendment "does not allow an award for any

instance of vexatious, frivolous, or bad-faith conduct," but allows an award "only

where the court finds that *the position* of the United States was vexatious, frivolous,

or in bad faith." (emphasis in original)). As Judge Vitaliano aptly noted in *United

States v. Ali*:

> What one might call a "theory-based" argument for damages under the Hyde Amendment, against the backdrop of the definitional requirement that the government "can present no rational argument based upon the evidence or law in support of that claim," would suggest that a criminal defendant claiming a Hyde Amendment grievance must show that the prosecution took a position either "foreclosed by binding precedent or so obviously wrong as to be frivolous."

2008 WL 4773422, at \*11 (E.D.N.Y. Oct. 27, 2008) (quoting *Manchester Farming P'ship*, 315 F.3d at 1183 (9th Cir. 2003)).

The prosecution of Kanekar and the other defendants involved in the conspiracy was neither "foreclosed by binding precedent" nor "obviously wrong." *See Gilbert*, 198 F.3d at 1304. ("Once a district court judge accepts the government's legal position it will be extremely difficult to persuade [a court] that the issue was not debatable among reasonable lawyers and jurists, i.e., that it was frivolous."); *see also Ali*, 2008 WL 4773422, at \*14 (denying fees under the Hyde Amendment where a merely "misguided" prosecution did not rise to the level of "frivolous or vexatious" because its "theory of liability exhibited [no] dishonest or improper motive or an intent to harass"); *United States v. Ness*, 2010 WL 1328264, at \*7 (S.D.N.Y. Apr. 5, 2010) (denying fees where defendant failed to show that the prosecution's insistence on an "improper" jury instruction—later rejected by the Second Circuit—rose to the level of bad faith).

Even if one could seriously argue that the prosecution had presented differing theories of liability based on the admissible evidence, Kanekar fails to demonstrate

how such a shift was inconsistent with the indictment, let alone vexatious, frivolous, or in bad faith such that an award of attorneys' fees would be warranted under the Hyde Amendment.  Rigidly confining the arguments and presentation of evidence by the U.S. Attorney at trial—particularly where, as here, the scheme involves an intricate conspiracy inevitably characterized by secrecy—would unduly hinder the prosecution's ability to effectively operate in a "fluid" trial process which routinely involves myriad unpredictable strategic and evidentiary decisions.  *Schneider*, 395 F.3d at 87-88 (quoting *Sherburne*, 249 F.3d at 1127); *see also Ali*, 2008 WL 4773422, at *15 ("[T]he cataloguing of every instance of intense disagreement between the parties over the life of an investigation and trial … contorts the Hyde Amendment into a vehicle for Monday morning quarterbacking Congress simply did not intend.").

Kanekar also accuses the U.S. Attorney of late disclosures of *Brady* material produced by the U.S. Attorney as 3500 material.  It is a stretch to characterize the disclosure in question, produced to defendants on April 20, 2022, as having been made on the "eve-of-trial," given that opening statements and the U.S. Attorney's first witness were scheduled to be called on May 23, 2022.  *See* Br. at 8; ECF Nos. 291, 309, 313; *see also United States v. Coppa*, 267 F.3d 132, 142 (2d Cir. 2001) (holding that due process requires only that *Brady* material be disclosed "in time for its effective use at trial").  Indeed, I am not persuaded the materials in the production

10

in question constituted *Brady* material.  And even if the 3500 material did contain

arguably exculpatory evidence, the pretrial record does not support a finding that the

prosecution failed to satisfy its disclosure obligations under *Brady* and *Giglio*.  *Cf.*

*United States v. Mitselmakher*, 2008 WL 5068609, at *11 (E.D.N.Y. Nov. 20, 2008)

(denying Hyde Amendment attorneys' fees where, even though the court

acknowledged that the prosecution "could have and should have done more to

investigate [the] case and satisfy its *Giglio* obligations," the defendants offered "no

evidence that the Government's failings were the product of ill-intent," and their

allegations of bad faith were "based on nothing but supposition").

### B. The Trial Record is Replete With Evidence of Kanekar's Guilt With Respect to Each of the Charges in the Superseding Indictment

Kanekar argues that the prosecution failed to present evidence of Kanekar's

guilt with respect to the kickback scheme and the false claims scheme, therefore

warranting attorneys' fees under the Hyde Amendment.  Br. at 5, 14.  This contention

reflects a distortion of the trial record.  The evidence unequivocally showed that the

defendants operated a scheme spanning several years designed to systemically

defraud Medicare and Medicaid programs out of tens of millions of dollars.  A dozen

other co-conspirators involved in the underlying scheme were indicted separately,

and all but one plead guilty.[2]    Of Kanekar's immediate co-defendants, one (Alexander Khavash) plead guilty and another (Victor Genkin) is currently a fugitive.  In my assessment of the evidence presented at Kanekar's trial, insofar as there may have been some weakness in the prosecution's case, it amounted simply to its failure to convince the jury beyond a reasonable doubt that the defendants, including Kanekar, knew either that the employees or other agents they paid to manage their clinics were paying patients to come to those clinics for health services, or that it was illegal to pay the managers to refer them patients (even if the managers did not pay the patients).  *Cf. Bove*, 888 F.3d at 611 n.30 ("To prove bad faith, [the defendant] would need to have shown that the government had acted dishonestly or deceptively.  Presenting a losing case is not in itself an act of bad faith.").  In effect, then, Kanekar's motion is premised on the faulty conclusion that the government should have (or did) know Kanekar's state of mind.  Indeed, had the defendants waived their right to a jury and elected to proceed with a bench trial before me in this case, I would have found them guilty in light of the evidence establishing their knowing involvement in the underlying fraudulent schemes.

---

[2] The remaining co-conspirator, Aleksandr Pikus, was convicted at trial; his conviction was subsequently vacated by the Second Circuit on Speedy Trial Act grounds.  *See United States v. Pikus*, 39 F.4th 39, 58 (2d Cir. 2022).

### 1.  *The Kickback Charges*

The U.S. Attorney put forth voluminous evidence—both testimonial and documentary—that Kanekar was aware that: (1) patients were being paid by the defendants' clinic managers to go to their clinics for health services (Trial Tr. at 1012:24-1013:7); (2) ambulette drivers were practically "herd[ing]" patients into and out of defendants' offices (Trial Tr. at 1015:8-23, 1016:8-13); and (3) an arrangement existed between the medical providers and the clinic managers providing that the managers would be paid to handle "patient acquisition" (Trial Tr. at 412:16-413:12, GX 902).  Moreover, the evidence showed that as part of the kickback scheme, Kanekar and her clinic managers wrote millions of dollars of checks to cash in order to pay ambulette drivers and patients to ensure that the clinic maintained a high volume of patients.  *See* Trial Tr. at 768:7-8 (clinic manager Mark Tsyvin testifying that he cashed checks to pay drivers), GX 217-A, GX 217-D, GX 217-F, GX 217-B, GX 217-C, GX 217-E.

Indeed, the prosecution's witness Roman Azimov, a clinic manager, testified that Kanekar told him that she knew that the managers were paying patients.  Azimov specifically recounted a conversation with Kanekar where he had collected checks from Kanekar and she had told him that "[s]he didn't want the patients to discuss in the clinics about receiving any kickbacks in her department." Trial Tr. at 1414:17-1415:23.  While the jury was free to discredit this testimony—and apparently did

13

so—the U.S. Attorney calling Azimov as a witness further undermines Kanekar's assertion that the prosecution was frivolous. *See Bove*, 888 F.3d at 611 (noting that "a prosecution is not vexatious, frivolous, or in bad faith simply because a witness whose testimony directly inculpates the defendant is arguably not credible"). If the jury had found Azimov's testimony credible, Kanekar almost certainly would have been convicted.[3]

### 2. The Tax Counts

Kanekar contends that the U.S. Attorney's conduct was also vexatious, frivolous, and in bad faith with respect to the tax charges in the indictment, which were directly related to the kickback scheme. Br. at 13. Kanekar argues that the testimony of her accountant Kuldip Madan—the single fact witness called by the prosecution to prove such counts—was insufficient, and that "the government either knew it had no reasonable basis to pursue these charges and did so anyway, or purposely avoided learning the truth about its allegations." *Id.* But as the U.S. Attorney notes, it was immaterial whether Madan knew that Kanekar was providing illegitimate checks under the guise of legitimate business expenses for the purposes of preparing her taxes. Opp. Br. at 23.

---

[3] Additional testimonial evidence strongly weighing in favor of a reasonable finding of Kanekar's knowledge of and involvement in the kickback scheme was elicited from chiropractor Alexander Khavash (Trial Tr. at 1012:24-1013:7; 1015:8-14; 1016:8-13), clinic manager Mark Tsyvin (Trial Tr. at 688:18-22), clinic manager Maksim Vernik (Trial Tr. at 1760:13-20), and occupational therapist Oleg Dron (Trial Tr. at 412:16-413:12).

14

Madan testified as to his personal knowledge of the "90/10 split" arrangement that Kanekar entered into with the clinic managers, a key aspect of the prosecution's case.  *See* Trial Tr. at 1257:16-1258:19; *see also* Trial Tr. at 1287:3-1289:3.  Under this arrangement, the medical providers paid 90% of Medicare and Medicaid reimbursement to the clinic managers "to cover everything from patient acquisition to everything related to the office." *See* Trial Tr. at 412:16-413:12 (occupational therapist Oleg Dron (charged separately) testifying that "patient acquisition" meant "making sure that [the] clinic will have patients all the time").  But the reasonable inference drawn by the U.S. Attorney's evidence is that this 90/10 split heavily favored the clinic managers because its primary purpose was to ensure that the clinics were filled with patients—not to cover the clinics' miscellaneous overhead costs.  Indeed, Madan specifically testified on cross-examination that Kanekar's contract with the clinic management companies, under which Kanekar would receive 10%, was "not a good contract," and that, in his business opinion, the contract was "not a good business deal" because Kanekar, who was a "professional," "was not getting enough." Trial Tr. at 1258:2-15; 1288:2-16; *see also* GX 902 (email from Kanekar to co-conspirator Aleksandr Pikus in which Kanekar states that she "did … not get [her] 10%").

Kanekar's criticism of the prosecution's theory and presentation of the Tax Counts is not sufficient to meet the demanding legal standard and rigorous factual

basis required by the Hyde Amendment.  As the Second Circuit observed in *Bove*, "even if the evidence against [the defendant] had been objectively insufficient, the government's position would not necessarily have been in bad faith." *Bove*, 888 F.3d at 611 n.30; *see also Schneider*, 395 F.3d at 87 ("We cannot accept [the defendant's] argument that the government's prosecution of him was vexatious, frivolous, or in bad faith because of the insufficiency of the evidence.").

### 3.  *The False Claims Scheme*

Kanekar claims that the U.S. Attorney's charging of the false claims scheme was similarly frivolous, vexatious, and in bad faith, principally because "the government was privy to the evidence fully debunking the legal and factual basis for the false claims charges." Br. at 14.  Specifically, Kanekar points to evidence allegedly demonstrating that she submitted Medicare claims through a billing service, and that the billing service, Brunswick Billing, a/k/a NPV Billing, must have improperly submitted the claims at issue.

The U.S. Attorney's allegations of Kanekar's guilt relating to this scheme, however, were hardly misplaced in light of the fact that Brunswick Billing was run by Kanekar's co-conspirators Aleksandr Pikus and Mishelle Neginsky-Singer (who were charged separately).  Trial Tr. 700:16-18; 732:11-16.  To the extent that Kanekar had authorized Brunswick Billing to submit claims on her behalf, Kanekar was nevertheless obliged to submit accurate bills.  Indeed, Kanekar understood that

electronic billing using her personal and unique national provider identification number reflected her "legal electronic signature[,] and constitute[d] an assurance by the provider that the services were performed as billed," and that Kanekar was "responsible for all Medicare claims submitted." GX 1401.  And the trial evidence demonstrated that the claims at issue were submitted under Kanekar's national provider identical number during periods when Kanekar was traveling out of the country.  *See* GX 605; GX 2211.  As such, the U.S. Attorney's case was not frivolous, vexatious, or in bad faith with respect to the false claims scheme.[4]

## **CONCLUSION**

Kanekar's motion for attorneys' fees and expenses is DENIED.

**SO ORDERED.**

Brooklyn, New York
June 29, 2023

*Edward R.  Korman*
Edward R.  Korman
United States District Judge

---

[4] Nor did the U.S. Attorney elicit testimony at all, much less in bad faith, regarding the medical necessity of the services that were billed, in contravention of the prosecution's prior representations that it would not seek to establish at trial whether such services were medically necessary.  And indeed, I agreed to specifically instruct the jury to provide additional clarity on this issue—as requested by defense counsel.  *See* Trial Tr. at 1702:9-1710:6; *see also* Trial Tr. at 3087:17-22 ("I instruct you that the issue of whether the Defendant billed Medicare, Medicaid, or any other insurance for services that were not provided or were not materially necessary is not an issue in this case, and not for you to decide.  The issue is entirely irrelevant to the Counts charged against the Defendants in this case.").